GEORGE C. SMITH, Appellant, *v.* HELENE SMITH, Respondent.

First Department, December 31, 1920.

**Husband and wife — annulment — parties married three years after disappearance of defendant's first husband — common-law marriage — allegations of complaint not proven — presumption of innocence in support of second marriage stronger than presumption of life as to first husband.**

In an action to annul a marriage on the ground that at the time the marriage was contracted, about twenty years before the action was commenced, the defendant had a husband living, it appeared that about three years before the plaintiff married the defendant, which marriage was ceremonial, she had married a man with whom she lived for a month when he disappeared.

*Held,* that at the end of five years after the defendant's first husband disappeared, a common-law marriage did not arise since both parties believed that they were wedded through a ceremonial marriage and there was no mutual consent, so far as the evidence shows, to the marriage relation except by virtue thereof.

The plaintiff was not entitled to a decree of separation since he did not establish his allegation that the defendant's former husband was living at the time of the marriage and that the defendant well knew that fact; the presumption of innocence in support of the marriage between the parties is stronger than the presumption of the continuance of life of the first husband.

APPEAL by the plaintiff, George C. Smith, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Bronx on the 29th day of July, 1920, upon a decision of the court rendered after a trial at the Bronx Special Term.

*Abner Greenberg,* for the appellant.

*Edward J. Reilley* of counsel [*Burger & Burger,* attorneys], for the respondent.

MERRELL, J.:

This action was brought by the plaintiff to annul his marrage with defendant upon the ground that at the time said marriage was solemnized the defendant had a husband living.

The allegations of the complaint by which the plaintiff

seeks to annul the marriage are that the plaintiff and the defendant were married on February 28, 1900; that at the time of said marriage the defendant had a former husband living, to wit, one Robert R. J. Johnson, to whom defendant was married on the 25th day of November, 1896, and that no divorce or annulment of such marriage had been theretofore decreed, and that five years had not elapsed from the date thereof, and such marriage was at the time of the marriage between plaintiff and defendant in full force and effect, and that defendant well knew that her former husband was then alive. The complaint further states that the issue of the marriage of the parties was a son of the age of sixteen years, and that the marriage between the parties was contracted by the plaintiff without any knowledge on his part of the defendant's former marriage.

The answer denied generally the allegations of the complaint with reference to said prior marriage, except that the defendant admitted her marriage to said Johnson, but denied that the marriage with the plaintiff was contracted without the knowledge on his part of such former marriage. As a separate and distinct defense defendant alleges that her marriage with Johnson prior to her marriage with plaintiff was followed by her being deserted by said Johnson, and that for more than three years prior to her marriage with the plaintiff defendant had made diligent inquiry and was informed and believed that Johnson was dead, all of which the defendant had explained to the plaintiff, and that the plaintiff was fully aware of the same prior to his marriage with the defendant.

The issues coming on to be tried, the parties presented their proofs, and the court held under such proofs that the defendant was lawfully married to said Johnson in the city and State of New York on the 25th day of November, 1896, and that said first marriage was in force at the time of the marriage between the plaintiff and the defendant. The court, as a conclusion of law, decided that the marriage entered into on the 28th day of February, 1900, between the plaintiff and the defendant was unlawful. Notwithstanding such findings of fact and conclusions of law, the court refused to find that the plaintiff was entitled to a decree annulling the said marriage with the defendant. This was upon the ground that it

appeared that after the marriage ceremony between the plaintiff and the defendant and more than five years after the disappearance of Johnson the plaintiff and defendant for some years continued to live and cohabit together as husband and wife, and that thereby a common-law marriage between the parties was established.

The evidence discloses that the marriage ceremony between the defendant and Johnson occurred November 25, 1896; whereas the marriage between the plaintiff and the defendant occurred February 28, 1900.

At the opening of the trial the plaintiff moved for judgment upon the pleadings, relying upon the presumption that Johnson, defendant's former husband, was living at the time of her marriage to the plaintiff. The court, for the time being, denied plaintiff's motion for judgment upon the pleadings, and thereupon the plaintiff rested.

The defendant was then sworn as a witness in her own behalf, and testified that she was married to the plaintiff about twenty years ago, and that two children were born of the marriage, the first of which lived but a few hours, but that a second son was born, who, at the time of the trial, was seventeen years of age, and was living with his parents in the city of New York. The defendant admitted that she was married to Johnson prior to her marriage with the plaintiff. She stated that at the time of the marriage with Johnson she was sixteen years of age, and at the time was employed in the Siegel-Cooper store in the city of New York, in connection with which store Johnson was also employed; that at that time Johnson was a man sixty-five years of age; that after their marriage she went with her husband to Jersey City and for about a month resided at Miller's Hotel in that city; that no issue was born of that marriage. She testified that at the end of a month's married life with Johnson she went to visit her mother in the city of New York, and that when she returned to Jersey City her husband was gone; that as she was sitting in the parlor of the hotel a man came up to her and said his name was Leffingwell, and that he told her that Mr. Johnson had been in a street railway accident, and that thereupon she went home to her mother; that afterwards she wrote to the hotel to

Mr. Leffingwell, but was never able to get any reply to her letters; that she wrote other places inquiring, and could not find out anything definite. She testified that she had written several letters in an effort to ascertain the particulars of her husband's accident. On cross-examination she was asked: " Q. Where was this railroad wreck that you speak of in which Mr. Johnson was killed? A. Mr. Leffingwell did not give me any details. Q. Well, he was your husband? A. He said he was in the hospital. * * * Q. Did you take any steps towards finding out where this accident was and where your husband was at the time? A. I wrote back to Mr. Leffingwell. Q. Is that all you did? A. For information. Q. Is that all you did? A. That was all I could do under the circumstances. Q. Well, could you not have gone to the hospital? A. Not when I did not know where it was. Q. Could you not have asked for the hospital? A. Who? Who would I ask? Q. Could you not have asked Mr. Leffingwell when he told you the first time? A. Well, I might have done so; I don't remember. Q. You did not do that? A. I don't know that I did not. * * * Q. So that you didn't do anything; is that right? A. Nothing more than write to try and find out, whenever I saw a favorable opportunity."

The defendant further testified that after her marriage with the plaintiff she lived with him continuously until about a year prior to the trial of the action; that her husband was until the prohibition law came into effect a liquor dealer having a liquor store or saloon in the city of New York, and that frequently the liquor tax certificate under which her husband was doing business had been issued in her name.

The plaintiff testified that after his marriage with the defendant they had only lived together as husband and wife for a period of about six years, but it appeared that ever since their marriage they had lived under the same roof. The son of the parties was sworn as a witness and testified that during his lifetime his father and mother had always lived together, and were living under the same roof at the time of the trial.

As to whether or not the plaintiff was informed at the time of his marriage with the defendant of the latter's previous marriage, the defendant testified that she could not remember that she had any particular conversations with the plaintiff

wherein she told him of her prior marriage. On cross-examination she was asked by counsel for the plaintiff: " Q. You are not quite sure, you told the Court, whether you told Mr. Smith you were married? A. I could not swear to it, but I know it was generally known in the family, and there was no secret about it. * * * Q. But you did not tell Mr. Smith that you were married to Mr. Johnson? A. I am not sure that I did not tell him. * * * Q. You made no effort to deceive Mr. Smith, did you? A. None whatever; Mr. Smith was married formerly, too." ·

The foregoing was substantially all of the evidence with reference to plaintiff's having been informed by the defendant or otherwise of her previous marriage with Johnson. While this evidence falls far short of showing that he was informed of such previous marriage, the plaintiff himself was sworn upon the stand and failed to testify that he was ignorant thereof. He was interrogated by his counsel as to when for the first time he learned of defendant's prior marriage. Counsel for the defendant objected to this question and it was withdrawn, and no further attempt was made to show when the plaintiff received such information or whether or not he was ever informed of the prior marriage. The natural inference would be that the plaintiff was at some time informed of defendant's prior marriage with Johnson. In any event, he does not swear that he was ignorant of such fact.

It seems to me that the court, under the evidence, was hardly justified in holding that a common-law marriage existed between the parties. A marriage at common law is based upon an agreement by the parties to live together as husband and wife, and in the absence of some direct proof that the plaintiff knew of the existence of the prior marriage, it seems to me that it can hardly be said that after the five-year absence of the defendant's husband, the plaintiff lived and cohabited with the defendant as husband and wife, so as to constitute a common-law marriage. Unquestionably, in the present state of our jurisprudence, common-law marriages have a recognized validity, and if intelligently entered into by parties having capacity to contract, such marriages are as valid as are those performed in accordance with statutory requirements. (*Matter of Ziegler* v. *Cassidy's Sons,* 220

N. Y. 98.)   The difficulty in holding that the union between the parties was valid as a common-law marriage arises from the fact that the element of intent and mutual consent of the parties to adopt such a relationship is entirely wanting.   The plaintiff and the defendant, so far as the evidence discloses, believed that they were wedded through a ceremonial marriage, and there was no mutual consent to the marriage relation, except by virtue thereof.   The two essentials of a common-law marriage are capacity and mutual consent.   At common law the marriage relation may be formed by words of present assent, *per verba de præsenti,* and without the interposition of a clergyman or person lawfully authorized to perform the marriage ceremony.   To   constitute a marriage *per verba de præsenti,* the parties must be in each other's presence when the agreement is made.   The agreement, however, need not be in the presence of witnesses.   It may be expressed by parol, or the parties may adopt whatever ceremony their choice or religious belief may suggest.   The vital element is the agreement itself, in whatever form it is adopted, which constitutes the contract and creates the relation.

Notwithstanding the difficulty in sustaining the judgment appealed from upon the decision of the court as made at the close of the trial, nevertheless, I think the judgment can and should be sustained upon the ground that the plaintiff failed to establish the cause of action set forth in his complaint. The plaintiff, as before stated, relied at the trial upon the presumption that having shown that the former husband was living at a time less than five years prior to the marriage of the parties herein, he was presumed to be alive at the time of the second marriage.   The presumption of life is well known in law.   Having been shown to have been living at the time of his marriage with the defendant, the law presumed that Johnson continued to live until the contrary was shown. Ordinarily a person absent and not heard of is presumed to be living until five years have elapsed.   Then the presumption is that he is dead.   The defendant's second marriage occurred three years and two months after Johnson was shown to be alive and there was no direct evidence of his death.   Notwithstanding such presumption of continuance of life, there always attaches to a marriage a presumption that the same

was valid and legal in all respects. Thus we have here the presumption of life opposed by the counter presumption that the marriage between the parties was an innocent and valid one. Treating this subject, Bishop in his excellent treatise on Marriage, Divorce and Separation (Vol. 1), says:

" § 949. When the validity of a marriage depends on the death of a former husband or wife, and there is no direct proof of this fact, the presumption of life antagonizes that of innocence, and both variously combine with the circumstances special to the case. The two presumptions coming thus into conflict, the question will be which in the particular instance must give way. Thus,—

" § 950. A person absent and not heard of is ordinarily presumed to be living until seven years have elapsed, then the presumption is that he is dead. But there is no presumption that the life continued during the entire period, or that it was extinguished at any particular time within it. Nor is the rule of seven years absolute; any circumstances may be shown creating a probability that life did not continue so long; or, on the other hand, special facts may neutralize the presumption though seven years have elapsed. Thereupon —

" § 951. If, while this presumption of the continued life of an absent party to a marriage remains, the other enters into a second marriage, the presumption of the innocence of such marriage operates as a counter presumption of death. Should it be urged that in natural reason the marriage does not render the death more probable, the reply is that actual belief and conclusion from presumption are not necessarily identical, yet truly the marriage is an added ground for inferring death. For right-minded men and women, as all are assumed to be, will not knowingly commit polygamy. And one who has lived in matrimony with another can judge better than a stranger of the probabilities of the other's death under the special facts best known to him; so that in the particular instance his conclusion is more likely to be right than the general rule of the law, which was framed by strangers for the average person and case. *  *  * .

" § 952. There is no absolute rule that either one of these conflicting presumptions shall give way to the other, but the leaning of the law is to innocence. Thus,—

" § 953. If a married partner has been absent and unheard of less than seven years, then the other marries, the law has no unyielding result, but in a general way favors the presumption of innocence, making the second marriage good. Yet the question of life or death is, under proper supervision of the court, of fact for the jury. And a finding was sustained which upheld a marriage entered into after one year's absence; and another, which refused to uphold it when celebrated within twenty-five days after the absent party was known to be alive.  *  *  *."

The same learned text writer says (§ 955):

" In conclusion of this sub-title, if, *when the suit* is brought, more than seven years have elapsed since the absent person was last heard of, there is strictly no conflict of presumption with presumption. Without calling in the presumption of innocence, he is now to be deemed dead. It is not now, therefore, pressing the presumption of innocence very far to place the time of the death near that of the disappearance, instead of leaving it to vibrate in uncertainty between such disappearance and the end of the seven years."

With relation to the general presumption favoring marriage the same writer says (§ 956):

" This presumption, expressed in the maxim *Semper præsumitur pro matrimonio,* is spoken of in an early chapter. Every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a strong presumption of its legality,— not only casting the burden of proof on the party objecting, but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void. So that this issue cannot be tried like the ordinary ones, which are independent of this special presumption. And the strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife. It being for the highest good of the parties, of the children, and of the community, that all intercourse between the sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seized upon all probabilities, and presses into its service all things else which

can help it, in each particular case, to sustain the marriage, and repel the conclusion of unlawful commerce."

And in conclusion, he says (§ 958):

" This doctrine explains why, as between the two presumptions of innocence and life, the law prefers the one which makes the marriage good. It extends through the entire law of marriage, and casts its weight beneficially into the balance when other considerations are conflicting, or their effect is doubtful."

Authorities by way of judicial decision are not wanting where the courts have applied the principle that the presumption of innocence in support of the marriage relation overbears that of life. It was said in *Teter* v. *Teter* (101 Ind. 129) that the presumption in favor of marriage and of the legitimacy of children is one of the strongest known to the law.

In *Hynes* v. *McDermott* (91 N. Y. 451) Judge ANDREWS, writing the unanimous opinion of the Court of Appeals, said (at p. 458): " The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In *Morris* v. *Davies* (5 Cl. & Fin. 163) Lord LYNDHURST, speaking of this presumption, says: ' The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive.' In *Piers* v. *Piers* (2 H. L. Cas. 331) Lord CAMPBELL said, that the presumption could be negatived only ' by disproving every reasonable possibility,' and Lord BROUGHAM, in the same case, approved the general doctrine stated by Lord LYNDHURST, in *Morris* v. *Davies,* and said that the presumption could be dispelled only by evidence which was ' clear, distinct and satisfactory.' "

Among English cases other than those cited by Judge ANDREWS, the case of *The King* v. *Inhabitants of Twyning in Gloucestershire* (2 Barn. & Ald. 386) is directly in point. In that case there was involved a settlement of Mary Burns, a

pauper, and two children of herself and one Francis Burns, from the township of Manchester to the parish of Twyning in the county of Gloucester. Seven years prior thereto the pauper, Mary Burns, had married one Richard Winter, with whom she lived a few months when he enlisted as a·soldier and went abroad on foreign service and was never thereafter heard from. A little over twelve months after his departure the pauper, Mary, then settled in the parish of Twyning, married the said Francis Burns, with whom she thereafter cohabited until the time of the trial. The two children were born during such cohabitation, and were children of Francis Burns and the pauper, Mary Burns. One of said children was born in the parish of Tewksbury, and the other in a parish in the city of Worcester. An appeal was taken to the Court of King's Bench from the order removing the said pauper and her children from the township of Manchester to the parish of Twyning. The appellants contended that the respondents were required to prove the death of Richard Winter prior to the marriage of the pauper with Francis Burns, and that in the absence of such proof the presumption of law was that he was then living, and consequently that the children would be considered as illegitimate and settled where born, and that as to them the order ought to be set aside. The Court of Sessions were of the opinion that the burden of proof rested upon the appellants to show that he was alive at the time of the second marriage, and confirmed the order. The King's Bench upheld the Sessions. BAYLEY, J., writing, said: " * * * this is a case of conflicting presumptions, and the question is, which is to prevail. · The law presumes the continuation of life, but it also presumes against the commission of crimes, and that even in civil cases, until the contrary be proved. * * * The cases cited only show when the presumption of life ceases, even where there is no conflicting presumption. The facts of this case are that there is a marriage of the pauper with Francis Burns, which is *prima facie* valid, but the year before that took place, she was the wife of Richard Winter, and if he was alive at the time of the second marriage, it was illegal, and she was guilty of bigamy. But are we to presume that Winter was then alive? If the pauper had been indicted for bigamy, it would clearly not be sufficient. In that case Winter must have been proved to have

been alive at the time of the second marriage. It is contended that his death ought to have been proved, but the answer is, that the presumption of law is, that he was not alive when the consequence of his being so is, that another person has committed a criminal act. I think, therefore, that the Sessions decided right in holding the second marriage to have been valid unless proof had been given that the first husband was alive at the time."

BEST, J., concurring, said: " I am also of the opinion that the Sessions have decided correctly in this case. They had a right to presume that the pauper had not committed a crime, and if so, the second marriage would be valid, unless proof had been given of the first husband being then alive. The cases cited are very distinguishable, they only decide that seven years after a person had been last heard of, you are in all cases to presume his death. But they do not show that where conflicting presumptions exist, you may not presume the death at an earlier period. Now, those conflicting presumptions exist here, and I think the Sessions were warranted in presuming the death of the first husband on the ground that they would not presume that the woman had committed bigamy."

The courts seem uniformly to have held where there are conflicting presumptions existing, that the presumption of innocence and in support of an apparently lawful marriage overbears the presumption of life.

In this case the defendant, at the time her first husband passed out of her life, was a young girl sixteen years of age. She had married a man many years her senior. It is perhaps not strange that she took no more active steps than the evidence disclosed to verify the information which she had received as to his injury and possible death. She testified that she did write and adopt other means which suggested themselves to her to ascertain the facts. I think the evidence conclusively disproves the allegation of plaintiff's complaint that the defendant at the time of her marriage with the plaintiff well knew that her former husband was living, and that it appears therefrom that she believed he was dead. That she was correct in such belief is borne out by the fact that although twenty years have elapsed since his disappearance, she has not since heard anything from him.

It seems to me that in the case at bar every presumption should be indulged to uphold the marriage of the parties. Such a result would seem to be for the best interests of the parties, and in particular in the interests of their seventeen-year-old son. Just what motive actuates the plaintiff in bringing the present action the evidence does not disclose. It appears that for twenty years he had made no complaint and has lived and cohabited with the defendant. They have reared to manhood a son. There is absolutely no evidence that defendant's former husband is living. He has not appeared upon the scene and so far as any proof is concerned, he is dead and every consideration of good morals would seem to demand that the marriage of the parties should not be annulled. Plaintiff alleges the previous marriage of the defendant, and that at the time of the marriage of the parties herein the former husband of the defendant was living, and that the defendant well knew the same to be true. The plaintiff failed to prove any of said allegations of his complaint. I do not think he can rely upon the presumption of life as against the presumption of innocence and validity of the marriage which he seeks to annul.

The sixth finding of fact contained in the decision herein, to the effect that the first marriage of the defendant was in force at the time of her marriage with the plaintiff, should be disapproved, as well as the first conclusion of law, that the marriage entered into between the plaintiff and the defendant was unlawful. The provision of the judgment of the court below that the plaintiff's complaint herein be dismissed upon the merits should be stricken out and in its place the defendant should have judgment dismissing the plaintiff's complaint, with costs, and, as so modified, the judgment appealed from should be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, SMITH and PAGE, JJ., concur.

Judgment modified as directed in opinion and as so modified affirmed, with costs to defendant. Settle order on notice.